UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

EVELYNE GUILLEBEAUX,

               Plaintiff,      :

                             :  **MEMORANDUM and ORDER**

     - against -

                             :   03 Civ. 6577 (NRB)

JEWISH CHILD CARE ASSOCIATION,

                             :

               Defendant.

----------------------------------------x

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Evelyne Guillebeaux ("Guillebeaux" or "plaintiff") brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by 42 U.S.C. § 1981 ("Title VII"), as well as under the New York State Human Rights Law and the Administrative Code of the City of New York, for alleged gender discrimination in her workplace. Discovery having been completed, plaintiff's employer, the Jewish Child Care Association ("JCCA" or "defendant"), now moves for summary judgment against all of plaintiff's claims. For the reasons set forth herein, JCCA's motion is denied in its entirety.

**BACKGROUND**

For purposes of the present motion, JCCA states that it accepts plaintiff's version of the facts as alleged. Accordingly, drawing all reasonable and favorable inferences in plaintiff's favor, as is appropriate on summary judgment, see,

e.g., Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160-61 (2d Cir. 1999), we set forth below the facts according to plaintiff.

**I.  Plaintiff's Employment at JCCA**

JCCA is a not-for-profit, non-sectarian human services agency serving the needs of children and families in the New York City area.  JCCA provides foster care, group and family day care, out-patient mental health services, community-based family development programs, educational programs, preventive services, a residential diagnostic center and group homes and residential treatment services for children and adolescents.

Plaintiff was hired by JCCA as an Office Manager in March 1998.  Plaintiff's initial responsibilities focused on relocating JCCA's facilities from Lexington Avenue to Wall Street in Manhattan.  In the period after that move, plaintiff's work involved routine office management functions such as overseeing receptionists and mail room clerks and coordinating messenger and package delivery services.  Over time, plaintiff began to assume additional duties and to work more closely with Floria Antell, JCCA's Business Director.  In June 2001, Ms. Antell retired and John Torok was hired to replace her as JCCA's Business Director.  Plaintiff then began to work more closely with Torok.

2

During the summer of 2001, Torok recommended to Richard Altman, JCCA's then-Chief Operating Officer (and, later, JCCA's Chief Executive Officer), and Sandy Shapiro-Malkin, JCCA's Vice President of Human Resources, that plaintiff be promoted to Assistant Business Manager. It was thereafter agreed that plaintiff would be promoted, and, effective September 1, 2001, plaintiff assumed her new position, which included a raise. In her new position, plaintiff reported directly to Torok.

## II. Torok's Alleged Sexual Harassment

Plaintiff contends that, from very shortly after he was hired, Torok engaged in sexually harassing conduct toward her. The harassment allegedly began with comments about the way plaintiff dressed, including remarks about how plaintiff's blouses accentuated her breasts. Plaintiff testified in deposition that, at least once, Torok called her at home in the evening and asked her what she was wearing, expressing concern that plaintiff's children should not overhear the conversation.

According to plaintiff, as she and Torok began traveling to and from job sites in agency vehicles together,[1] Torok began to talk "constant[ly]" about sex, frequently complaining about his

---

[1] During Torok's first months at JCCA, before he obtained his own agency vehicle, work responsibilities required plaintiff and Torok to be alone traveling together approximately three or four times per week.

lack of sexual relations with his wife. Pl. Dep. Tr. 67. Even after Torok obtained his own agency car, JCCA duties required Torok, plaintiff and Floria Antell, who was then working as a consultant to JCCA, to drive together from JCCA's Manhattan offices to a JCCA construction site in the Bronx. During these drives, Torok talked "incessantly" about sex, Antell Aff. ¶ 4, and continued to complain about his lack of sexual relations with his wife. Torok allegedly stated that his wife was depressed and that he had hoped that obtaining his new agency car would impress her such that she would begin to sleep with him again but that she nevertheless continued to refuse his advances. According to plaintiff, Torok also stated to plaintiff and Antell that, because he was not having sexual relations with his wife, he "was going to start looking for sex in the city." Pl. Dep. Tr. 84-85, 113-14.

Plaintiff alleges that Torok's talk of sex continued in JCCA's offices, where Torok called plaintiff into his private office frequently. On some of these occasions, Torok allegedly complained about his sex life with his wife and, on one occasion, asked plaintiff "whether it would be a problem if he was to sit there and watch [plaintiff] get undressed" because Torok's wife was uncomfortable undressing in front of him. Pl. Dep. Tr. 89.

Plaintiff contends that Torok's conduct also included physical harassment. On one occasion in Torok's office, for example, plaintiff alleges that Torok "patted [her] on the behind" but then apologized and "said that he better stop before he gets in trouble, but it is the nature of his upbringing that his father used to jump behind his mother and just grab her like such." Pl. Dep. Tr. 76-77. On another occasion, shortly after it was decided in summer 2001 that plaintiff would be promoted to Assistant Business Manager, Torok called plaintiff into his office and reported the news to her. According to plaintiff, Torok then shut his office door, congratulated plaintiff on her promotion and gave her a "big touchy-feeley hug" that made plaintiff feel uncomfortable. Plaintiff contends that she stepped back from Torok immediately but did not report the matter to anyone at JCCA. Pl. Dep. Tr. 68-70.

As plaintiff assumed more responsibilities and began to work more closely with Torok, Torok allegedly began to pressure plaintiff to sleep with him by offering her agency perks. For example, plaintiff contends, Torok bragged to her that he had obtained for her a large pay raise with her promotion and told plaintiff that he would attempt to "reward" her further by getting more perks for her, including tuition reimbursement and an agency car with extra features such as a sunroof. Torok also

5

allegedly told plaintiff that he intended to get her promoted to a position within JCCA that included free housing, but that, if she obtained the position, plaintiff should keep a room reserved for Torok in whatever housing was provided to her. Plaintiff contends that Torok told her he hoped that obtaining extra perks such as these would wear down her resolve such that she would feel obligated to sleep with him.

**III.    The Deterioration of Plaintiff's and Torok's Working Relationship**

In the spring of 2002, the relationship between plaintiff and Torok appears to have deteriorated.  Plaintiff alleges that Torok began to tell her that she had a "bad attitude," Pl. Aff. ¶ 4, that Torok began unjustly criticizing her work and questioning her schedule and accountability, and that Torok started not to support her in her work.  Plaintiff further alleges that Torok began to criticize her work openly to Altman (who, as noted above, was at the time JCCA's Chief Operating Officer) and that Torok stated to both plaintiff and Altman that he would not "protect" plaintiff anymore.[2]

In July 2002, Torok talked to plaintiff "about relieving her of her responsibilities and restructuring her position" by demoting her to the position of Office Manager in JCCA's recently opened Bronx facilities.  Torok Dep. Tr. 184.  Torok told plaintiff that "if [JCCA] c[ould not] come up with a corrective plan [addressing plaintiff's alleged emotional outbursts and mistakes], . . . she could ultimately lose her

_____

[2]    Somewhat inconsistently with the above allegations, plaintiff contends that, during this period of time, Torok also recommended to Altman that plaintiff be given a raise and promoted to Business Director.  Plaintiff acknowledges that Torok recommended to Altman on June 27, 2002 that she be taken to lunch at JCCA's expense in recognition of "her long hours and hard work."  Clark Aff., Ex. 38.

job, [and] that she needed to become more of a team player and not be flying solo." Id. 184-85. Torok ultimately did recommend to Altman on July 22, 2002 that plaintiff be demoted to Office Manager of JCCA's Bronx office.

## IV. Plaintiff's Complaint to JCCA Management

Also on July 22, 2002, plaintiff approached Altman in an effort to speak to him about her problems with Torok, including Torok's alleged sexual harassment.[3] Altman took plaintiff to his office, where plaintiff told him that she thought her recent friction with Torok was due to her rebuffs of Torok's sexual advances. In support of her position, plaintiff recounted to Altman many of the details of Torok's alleged conduct that we have explained above.

According to plaintiff, on hearing plaintiff's story, Altman stated, "if this is what is happening, what has been happening, I will fire [Torok]." Pl. Dep. Tr. 108. However, plaintiff contends, Altman "said that, well Sandy [Shapiro-Malkin] is not in, [but] when she comes in, we will have a meeting, but

_____

[3] It is not clear from plaintiff's submissions whether, at the time she approached Altman, plaintiff was aware of Torok's recommendation to Altman the same day that plaintiff be demoted.

immediately his response was if this is what he is doing, I will not tolerate anything like that, I will fire him."[4]

The following day, when Malkin returned to the office, Altman and Malkin met with plaintiff in Malkin's office. Plaintiff again recounted the advances that Torok had allegedly made toward her. Malkin advised plaintiff that if plaintiff wanted to pursue the matter she should file a written complaint against Torok. According to plaintiff, Malkin attempted to dissuade plaintiff from making a formal complaint, telling her that it would be her word against Torok's, that "there [wa]sn't any real protection" for plaintiff and that the matter should be handled informally by Malkin simply talking to Torok. Malkin Dep. Tr. 124; Pl. Dep. Tr. 121. Malkin eventually obtained from plaintiff the names of four witnesses to Torok's alleged conduct and stated that she would look into plaintiff's allegations. Altman and Malkin concluded the meeting by telling plaintiff

---

[4] Plaintiff's opposition papers contend that, at the July 22, 2002 meeting, Altman "attempted to discourage Guillebeaux from making a formal complaint." Pl. 56.1 ¶ 87. However, plaintiff does not describe what, if anything, Altman did to "discourage" her. Rather, in support of her contention, plaintiff's Rule 56.1 statement simply cites a submission by plaintiff to the E.E.O.C., which contains similar conclusory language. See Clark Aff., Ex. 51 ¶ 20 ("On July 22, 2002, I spoke with Altman about Torok's sexual harassment of me. Altman attempted to discourage me from speaking with anyone else about the situation or from making a sexual harassment complaint.").

that they would report back to her after they conducted an investigation of her allegations.

The next day, July 24, 2002, Altman and Malkin sent plaintiff a memorandum stating that they had received her complaint on July 23, 2002 and requesting that plaintiff submit a detailed written description of her charges against Torok, including dates, times and witnesses. On July 29, 2002, plaintiff submitted the requested written description.

## V.    The Investigation

Between July 23, 2002, when Altman and Malkin initially met with plaintiff, and July 29, 2002, when plaintiff submitted her written statement, Altman and Malkin spoke with each other about the need to schedule a meeting with Torok. No formal action was taken, however, until after plaintiff submitted her statement. During the few weeks after the statement was submitted, Altman and Malkin interviewed several JCCA employees, including Torok, Torok's secretary and three of the witnesses that plaintiff had identified in her written statement.[5]

---

[5]    Plaintiff alleges that these interviews were conducted improperly because Malkin suggested to the interviewees that plaintiff's complaints were baseless. For example, plaintiff alleges, Malkin told one witness that plaintiff was "flirty" and that JCCA was lucky to have Torok in its employ. Malkin allegedly told another interviewee that the situation with Torok was plaintiff's fault because plaintiff acted flirtatiously.

By late August 2002, plaintiff had not heard back from Altman and Malkin regarding the results of the investigation. On August 26, 2002, therefore, plaintiff's attorney delivered a letter to Paul Gitelson, JCCA's then-CEO, informing him of plaintiff's claims and stating that no corrective action had yet been taken. Gitelson apparently told Altman about the letter and forwarded it to Malkin.

Approximately two days later, Altman and Malkin met to speak about a resolution of plaintiff's complaints. According to Altman, Malkin showed him the attorney's letter to Gitelson and stated, in substance, "we've got to complete this investigation and really come to a determination because [plaintiff] ha[s] already filed a charge against us and we ha[ve] to get this done." Altman Dep. Tr. 157-58. It was then determined that plaintiff and Torok had mutually engaged in "sexual banter between the two of them," Altman Dep. Tr. 122,[6] and that several actions would be taken against Torok for what was determined to have been his inappropriate conduct: (i) Torok would be told that his anticipated promotion was "off the table," with the associated raise reduced by fifty percent; (ii) Torok would receive a notice in his file "relative to how he comports

---

[6] Plaintiff disputes that she partook in any such "banter" and contends that no witness other than Torok alleges that she ever engaged in such conduct.

himself in the workplace;" (iii) Torok would be required to apologize to plaintiff for engaging in inappropriate conduct; and (iv) Torok would be told that "any further violation in any way of Miss Guillebeaux's rights" would result in dismissal. Altman Dep. Tr. 125. In turn, Altman and Malkin determined that plaintiff would be told about Torok's reprimands and that, although plaintiff and Torok would have to continue to work together, "things would be monitored closely." Id. Plaintiff was told that she should not "encourage" any sexual conversations with Torok and that, if she made any "sexual comments" going forward, she would face repercussions for doing so. Id. at 139. Finally, plaintiff was told that if she had any complaints going forward she should bring them directly to Malkin's attention immediately.

## VI. The Alleged Retaliation

In light of Altman's and Malkin's determinations, plaintiff continued to work with and report to Torok. Plaintiff contends, however, that she was retaliated against for making her complaint. For example, plaintiff argues, although she continued to retain the title "Assistant Business Manager," subsequent to her complaint: (i) there was a period of time during which JCCA administration did not deal with her directly; (ii) areas of responsibility that had previously been

plaintiff's (e.g., telephone systems, facilities, billing for supplies) increasingly were taken over and handled directly by Torok; (iii) Torok caused mail that previously would have been seen by plaintiff to be rerouted around her; (iv) Torok advised plaintiff that there was no reason for her to attend meetings that she previously would have been expected to attend; (v) outside consultants to JCCA were instructed not to deal directly with plaintiff; (vi) at least one JCCA employee who previously had been subordinate to plaintiff was promoted without plaintiff being consulted; (vii) Torok began to refer to plaintiff as "Facilities Supervisor" and/or "Facilities Management Supervisor," rather than "Assistant Business Manager;" and (viii) Torok complained to Altman and Malkin about plaintiff's job performance, even though such complaints were unjustified.

Torok also allegedly began openly to criticize plaintiff's work. For example, Torok told plaintiff that he was beginning to receive complaints about her job performance. When plaintiff requested specifics or documentation of those complaints, Torok allegedly told plaintiff that he was keeping notes of the complaints and "building a case" against her. On January 17, 2003, Torok told Altman and Malkin in an e-mail that plaintiff was becoming "out of control" and suggested that plaintiff be given "a paid leave of absence . . . until this is settled."

Clark Aff., Ex. 33. Plaintiff also alleges that Torok told various JCCA employees that plaintiff would be fired and that Torok distributed a "position description" that described responsibilities for "anyone who would replace [plaintiff] in the future." Clark Aff., Ex. 36.

Plaintiff alleges that, although she complained to Altman and Malkin that she found it difficult to work with Torok because of the tension created by the sexual harassment issues and the alleged retaliation, Altman told plaintiff that "it was very hard for [him and Malkin] to figure out how she was going to be assistant business manager if . . . she couldn't find a way to -- find a comfort level working with [Torok]." Altman Dep. Tr. 143.

Plaintiff alleges that Malkin and Altman also retaliated against her. Although plaintiff and Malkin initially shared a constructive relationship after plaintiff's informal complaints, plaintiff alleges that, after she filed a Charge of Discrimination with the E.E.O.C. on January 3, 2003, Malkin began to retaliate against her by taking away office equipment, by forcing plaintiff to abide by stricter rules than those governing other employees and by yelling at plaintiff for no reason. This conduct allegedly continued through the fall of 2003. Although plaintiff reported these incidents to Altman and

14

requested that some action be taken to ameliorate the situation, no action was in fact taken. In fact, plaintiff alleges, although she specifically requested by e-mail to be permitted an opportunity to report further retaliatory conduct aimed at her, Altman never responded to plaintiff's e-mail or sought any other explanation from plaintiff. Altman Dep. Tr. 164-65. Instead, plaintiff was told in the fall of 2003 that Malkin would be her immediate supervisor from then on.

Finally, plaintiff alleges that in retaliation for her complaints JCCA failed to promote her. When Torok left JCCA in June 2004, plaintiff alleges, an employee who had been promoted the year before without plaintiff's consultation was promoted to the position of Business Director and plaintiff's supervisor. Plaintiff alleges that she was more qualified than this person to hold the position of Business Director. In fact, plaintiff alleges, in April 2002 Torok had recommended plaintiff for the same position.

## VII.    Plaintiff's Claims

Plaintiff contends that, among other things, the conduct described above created a hostile work environment and constituted actionable retaliation under federal, state and local civil rights laws. Specifically, she asserts claims under: (i) Title VII; (ii) the New York State Human Rights Law,

15

Executive Law § 296 <u>et seq.</u> (the "Executive Law"); and (iii) the Administrative Code of the City of New York § 8-107 <u>et seq.</u> (the "City Law"). JCCA moves for summary judgment against all of those claims. It argues that, as a matter of law, the conduct alleged by plaintiff does not rise to actionable harassment. JCCA argues further that, even if the alleged conduct were actionable, plaintiff's failure to avail herself of JCCA's established sexual harassment complaint procedures in a timely fashion provides JCCA with an affirmative defense to liability under <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998), and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998). For the reasons set forth below, JCCA's motion is denied.

## DISCUSSION

### I. Summary Judgment Standard

A motion for summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). However, credibility determinations, weighing evidence and drawing legitimate inferences from facts are functions that the Court must leave to the jury rather than

16

assume in deciding a summary judgment motion.  <u>See</u> <u>id.</u>  If the non-moving party has presented evidence from which a reasonable jury could return a favorable verdict, then summary judgment is not appropriate.  <u>See, e.g.</u>, <u>Golden Pacific Bancorp. v. F.D.I.C.</u>, 375 F.3d 196, 200 (2d Cir. 2004).

## II. Hostile Work Environment Under Title VII

In order to prevail on a hostile work environment claim under Title VII,[7] a plaintiff must show:  (i) that the harassment suffered was actionable, <u>i.e.</u>, that it was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment;" and (ii) that a basis exists to impute liability for the conduct at issue to the employer.  <u>Alfano v. Costello</u>, 294 F.3d 365, 373 (2d Cir. 2002) (citation omitted); <u>see also</u> <u>Feingold v. New York</u>, 366 F.3d 138, 149-52 (2d Cir. 2004).  Assuming that a plaintiff has proved the first prong, then liability may be imputed to the employer if the conduct at issue was undertaken by a supervisor and the harassment resulted in a "tangible employment action."

_____

[7]  As was noted above, plaintiff asserts claims under federal, state and local law.  The parties agree, however, that the same legal framework and standards of proof apply in the context of the state and local statutes at issue here as apply under Title VII.  We therefore assume the same herein, and all references to Title VII in the discussion that follows should be read to apply equally to plaintiff's claims under the Executive Law and the City Law.  <u>See generally</u> <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 122 n.2 (2d Cir. 2003).

<u>Burlington Indus., Inc.</u>, 524 U.S. at 761. If no tangible employment action was taken, then a defending employer may raise an affirmative defense to liability for harassment by a supervisor employee (the "<u>Burlington</u>/<u>Faragher</u> defense"). The <u>Burlington</u>/<u>Faragher</u> defense requires the employer to establish that: (i) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (ii) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. <u>See</u> <u>Burlington Indus., Inc.</u>, 524 U.S. at 765; <u>Faragher</u>, 524 U.S. at 807.

### A. Actionable Conduct

JCCA argues that, even as alleged by plaintiff, Torok's conduct was not "sufficiently severe or pervasive" to constitute actionable harassment under Title VII. In support of its argument, JCCA characterizes plaintiff's complaint as alleging approximately five isolated incidents of improper conduct.[8]

---

[8] JCCA characterizes plaintiff's allegations as consisting of the following: (i) "[w]hile Plaintiff was driving Mr. Torok in her car, he allegedly complained to her about the fact that he was not having sexual relations with his wife;" (ii) "[w]hen he informed Plaintiff of her promotion to Assistant Business Manager, he gave her a congratulatory hug;" (iii) "[o]n one occasion, the time of which Plaintiff cannot recall, Mr. Torok allegedly touched her buttocks, and immediately apologized;" (iv) "Mr Torok called Plaintiff at home after late business meeting[s], to discuss work related issues, and on one occasion, the time of which Plaintiff cannot recall, he allegedly asked

18

In order to be "sufficiently severe or pervasive to alter
the conditions of the victim's employment and create an abusive
working environment," the conduct at issue "must be
intimidating, hostile, or offensive, with discriminatory
intimidation, ridicule, and insult permeating the workplace."
Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir. 1998).
Moreover, the plaintiff must establish both that he or she
subjectively perceived the environment to be hostile or abusive
and that a reasonable person would have so perceived it.  See
id.  In considering the latter, objective standard, it is
necessary to examine all the circumstances alleged, including
"the frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere
offensive utterance; and whether it unreasonably interferes with
[the] employee's work performance."  Harris v. Forklift Systems,
Inc., 510 U.S. 17, 23 (1993).

There can be no question here that plaintiff subjectively
perceived her working environment to be sufficiently hostile and
abusive.  We also think that reasonable jurors could agree with
that perception.  JCCA's characterizations notwithstanding,
plaintiff's allegations are not limited to a few, isolated

---

her about what she was wearing;" and (v) "Mr. Torok allegedly
complimented Plaintiff on her appearance."  JCCA Opening Br. 6.

incidents.  As noted above, plaintiff contends that Torok engaged in "constant conversations" about sex and that those occurred "over and over . . . almost every time [plaintiff and Torok] were alone."  Pl. Dep. Tr. 67, 83.  Plaintiff further alleges, among other things, that Torok asked her whether he could watch her undress, that he touched her buttocks, that he called her at home to ask what she was wearing and that he continually offered her agency perks in expressed hopes that she would submit to sex with him.  Taken as a whole, these allegations raise issues of material fact as to whether Torok's alleged conduct is actionable.  Such issues are not resolvable on summary judgment.

### B.   JCCA's Liability

JCCA contends that, even if there are fact issues on the question whether Torok engaged in actionable conduct, summary judgment is nevertheless appropriate because plaintiff cannot establish a basis for imputing liability to JCCA.  First, JCCA argues, there was no "tangible employment action" that affected plaintiff.  Second, the <u>Burlington</u>/<u>Faragher</u> doctrine precludes liability as a matter of law.

A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote,    reassignment    with    significantly    different

responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc., 524 U.S. at 761. Plaintiff alleges that Torok's attempts to gain for her pay increases, promotions, business equipment upgrades and an agency car in hopes of getting plaintiff to submit to sex with him, as well as Torok's alleged conduct after he realized that plaintiff would not give in to his advances,[9] constituted tangible employment actions. JCCA obviously disputes this contention.

For several reasons, it is questionable whether plaintiff can establish that she suffered a tangible employment action. For example, it is not clear that actions that were not "adverse" in this context (e.g., Torok's alleged offers of agency perks) can be considered tangible employment actions.[10] Moreover, it is not clear that any of the alleged actions-- either individually or in the aggregate--could constitute a

_____

[9] As noted above, plaintiff alleges that Torok began in early 2002 to tell her she had a "bad attitude," to unjustifiably criticize her work, to send her hostile e-mails, to give her too much work without providing her the necessary support to complete it and to threaten her with firing if she did not become a "team player."

[10] In a "submission" case, an employment action may be "tangible" even if not "adverse." See, e.g., Jin v. Metropolitan Life Ins. Co., 310 F.3d 84, 98-101 (2d Cir. 2002) (holding that, where plaintiff submitted to harasser's sexual demands, use of the submission as the basis for job decisions, including continued employment, was actionable). However, plaintiff does not contend that she submitted to Torok's alleged sexual demands.

"significant change in employment status" within the meaning of Burlington Industries, Inc. It is not necessary to resolve these issues, however, because even if a tangible employment action did not occur there are fact issues that preclude summary judgment on the question whether Burlington/Faragher applies.

As noted above, the Burlington/Faragher defense applies only when a defendant can demonstrate: (i) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (ii) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. In examining the first prong of this test, it is relevant to note that JCCA had in place a sexual harassment policy with complaint procedures. The existence of such a policy is not dispositive, however. See, e.g., Mack, 326 F.3d at 128; Hill v. Children's Hospital, 196 F. Supp. 2d 389, 399 (S.D.N.Y. 2002); Bennett v. Progressive Corp., 225 F. Supp. 2d 190, 206 (N.D.N.Y. 2002). Plaintiff argues that the investigation undertaken by JCCA in response to her complaint was insufficient. For example, plaintiff alleges that she complained to JCCA management on July 22, 2002 but was unable to obtain any substantive response until late August 2002. When she finally did receive a response in late August 2002,

22

plaintiff argues, it was due only to her attorney's efforts in writing to JCCA's CEO and not to Altman's or Malkin's impetus. Moreover, plaintiff contends, Malkin's interviews with plaintiff and her witnesses were improper because, among other things, Malkin did not take notes and in fact suggested to her interviewees that the alleged harassment may have been plaintiff's fault. As described above, plaintiff also argues that various individuals at JCCA, including Malkin and Altman, retaliated against her in the period subsequent to her initial complaint. Although it is true that, as JCCA argues, there is no allegation that Torok's alleged harassment continued after plaintiff submitted her initial complaint, we cannot say definitively in these circumstances that no reasonable jury could conclude that JCCA failed to exercise reasonable care to prevent and correct promptly the conduct of which plaintiff complained. See, e.g., Hill, 196 F. Supp. 2d at 398-400 (issue of fact exists as to reasonableness of employer response when, among other things, dispute existed as to promptness and thoroughness of investigation); cf. Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 441 (2d Cir. 1999) (stating, in context of co-worker harassment, that "'[i]f the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is

inappropriate'" (quoting <u>Gallagher</u>, 139 F.3d at 348)). Accordingly, summary judgment would be inappropriate on the first prong of <u>Burlington</u>/<u>Faragher</u>.

On the second prong of <u>Burlington</u>/<u>Faragher</u>, <u>i.e.</u>, whether plaintiff unreasonably failed to take advantage of JCCA's harassment policy or to avoid the alleged harm otherwise, summary judgment is a closer question. As JCCA argues, plaintiff did wait over one year from when she contends that the harassing conduct began to complain to Altman and Malkin. In responding to this point, plaintiff argues that she credibly feared retaliation if she complained. In support of that argument, plaintiff points to her allegations that, when she first reported the alleged harassment in July 2002, Altman and Malkin attempted to dissuade her from pursuing her complaint. This argument, however, does not account for the intervening year in which plaintiff did not complain.[11] In any case, in

_____

[11] A plaintiff may rebut a failure timely to take advantage of an employer's complaint procedure by establishing a "credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint." <u>Caridad v. Metro-North Commuter Railroad</u>, 191 F.3d 283, 295 (2d Cir. 1999). In this case, plaintiff asserts in an affidavit that she "did not immediately report the sexual harassment to which Torok subjected [her] because [she] was embarrassed by it, was afraid that if [she] did complain [she] would not be seen as a team player, and was afraid that by complaining [she] might place [her] job in jeopardy." Pl. Aff. ¶ 3. A "credible fear," however, "must be based on more than the employee's subjective belief. Evidence must be produced to

latter case, the parties should inform the Court of the number of days required for trial.

**IT IS SO ORDERED.**

DATED:    New York, New York
          May 25, 2005

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

25

Copies of the foregoing have been mailed on this date to the following:

Counsel for Plaintiff

Anne L. Clark, Esq.
Vladeck, Waldman, Elias & Engelhard, P.C.
1501 Broadway, Suite 800
New York, NY 10036

Counsel for Defendant

Richard A. Levin, Esq.
Proskauer Rose LLP
1585 Broadway
New York, NY 10036